IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLE DELORES FORD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 21-1432 |
| KILOLO KIJAKAZI, | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

**Timothy R. Rice**                                                                                                       **April 22, 2022**
**U.S. Magistrate Judge**

      Plaintiff Nicole Ford alleges the Administrative Law Judge (ALJ), who denied her claim for Disability Insurance benefits (DIB), erred by: (1) discounting the opinion of her treating psychiatrist without substantial supporting evidence; (2) relying on vocational expert (VE) testimony that failed to incorporate all her credibly-established limitations; and (3) acting pursuant to delegated authority that violated the Constitution's separation of powers. Pl. Br. (doc. 14) at 6, 9, 14, 16. For the reasons explained below, I deny Ford's claims.

      Ford, a 34-year-old licensed clinical social worker at the time of the ALJ's opinion, alleged she was unable to work because of her mental impairments, R. at 231, 245, later adding a complaint that she also suffered from fibromyalgia, id. at 45. According to Ford, those conditions and the side effects of the medications they required so limited her ability to fall and stay asleep, her memory, her ability to concentrate, and her ability to sit or stand, that she was unable to perform any full-time work as of December 31, 2016, her date last insured (DLI).[1] Id.

---

[1]     To qualify for DIB, claimants must establish their condition became fully disabling before their DLI. 20 C.F.R. §§ 404.130, 404.132; see also Jakubowski v. Comm'r of Soc. Sec., 215 F. App'x 104, 105 (3d Cir. 2007) (claimant must show disability onset date before "expiration of her disability insured status"), De Nafo v. Finch, 436 F.2d 737, 739 (3d Cir. 1971) (noting claimant must demonstrate disability on or before the date he "last met the earnings requirements under the Social Security Act" to obtain benefits).

at 50-52, 218.  The ALJ acknowledged that Ford's mental health condition was a serious impairment and agreed she could no longer perform stressful, skilled work.  Id. at 26.  The ALJ noted that, however, despite her limitations, Ford was able to function as a stay-at-home mother to five children, even supervising the home-schooling of her three eldest.  Id. at 32.  She further pointed out that Ford produced no formal diagnosis of fibromyalgia or evidence that she met the Social Security Administration's diagnostic criteria before her DLI.  Id. at 24 ("there is no mention of tender points"); see also SSR 12-2p, Evaluation of Fibromyalgia (July 25, 2012) (formal diagnosis of fibromyalgia requires an acceptable medical source to find: (1) a history of widespread pain; (2) at least 11 tender points; and (3) an exclusion of other diagnoses).  The ALJ then found, based on VE testimony, that there is a limited scope of simple, unskilled work Ford could perform despite her disabilities.[2]  R. at 26.

Medical Opinion

Ford argues the ALJ failed to properly analyze the consistency and support her treating psychiatrist's opinion finds in the medical record.  Pl. Br. at 6-19.

The ALJ concluded the opinion of Ford's treating psychiatrist, Dr. Knight, was "not persuasive" because it was not consistent with: (1) Dr. Knight's clinical notes; (2) Ford's ability to raise five children and homeschool three children; and (3) Ford's ability to wean herself off medications during two pregnancies.  Id. at 32.  The ALJ also found (4) Dr. Knight's opinion

---

[2]   "[T]hrough the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she was limited to simple, routine tasks at the low end of the stress spectrum meaning: the same duties are performed at the same station or location and during the same hours from day to day; [] no production paced work meaning production requirements can be made up by the end of the workday or shift; and [] no contact with the general public and only occasional interaction with coworkers and supervisors.  She will be off task from 10-15% of the workday in addition[] to normal breaks."  R. at 26.

was offered years after Ford's DLI, (5) utilizing a diagnosis that was not reached until years after the DLI, and that it (6) provided no rationale for finding two functional areas markedly limited. Id. The specific inconsistencies the ALJ mentioned with Dr. Knight's clinical notes were that Dr. Knight wrote that Ford was "no longer able" to work as of January 2014, but her notes showed Ford had told Dr. Knight she had always wanted to be a stay-at-home mother and housewife, and "the nature and extent of the treatment she prescribed" was not consistent with the two functional areas she opined were markedly limited. Id.

For claims filed after March 27, 2017, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a); see also 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (treating medical source opinions regarding claims filed on or after March 27, 2017, are not subject to the "treating physician rule" in 20 C.F.R. § 404.1520, but are instead evaluated under 20 C.F.R. § 404.1520c). Although the regulation lists a host of considerations that can make a medical opinion more or less persuasive, the most important considerations, and the only considerations ALJs must articulate, are the "consistency" and "supportability" of the opinions based on the record evidence. Id. § 404.1520c(b)(2); see also DeJesus v. Kijakazi, No. 20-6115, 2022 WL 1062914, at *9 (E.D. Pa. Apr. 8, 2022) (describing new legal standard); Vinay v. Kijakazi, No. 21-51, 2021 WL 4340554, at *2 n.2 (W.D. Pa. Sept. 23, 2021) (same); John B. v. Kijakazi, No. 19-16558, 2021 WL 3630307, at *9 (D.N.J. Aug. 17, 2021) (same); Quinn v. Saul, No. 20-813, 2021 WL 1695186, at *6 (M.D. Pa. Apr. 29, 2021) (same).

Ford argues the ALJ's opinion is both legally and factual erroneous. Pl. Br. at 6-19. She contends the ALJ erred legally by: (1) failing to explain whether the opinion was "supportable,"

id. at 11; (2) failing to give the opinion additional weight despite the treating physician's long-term relationship and psychiatric specialty, id. at 13; and (3) considering Ford's care of her own children when determining her functionality, id. at 14-15. She argues the ALJ erred factually in finding the opinion inconsistent with the medical record because (4) the opinion was supported by clinical findings and reasonable explanations, id. at 12-13; (5) Ford's leaving work was precipitated by a "meltdown," and was thus evidence of her disability, id. at 14; (6) she did not wean herself off medication during pregnancy, but rather increased her medications, id. at 15; (7) the ALJ should not have held the opinion's post-DLI date against its persuasiveness because it specifically noted it applied to the earlier time period, id. at 16; (8) the ALJ should not have held the use of Ford's post-DLI diagnosis of Bipolar Disorder against the opinion's persuasiveness because her pre-DLI symptoms were consistent with and likely attributable to the condition, id. at 16-17; and (9) Dr. Knight did provide a rationale for the marked limitations – Ford's mood issues and inability "to handle stress," id. at 17-18.

       Ford's legal arguments fail. As for "supportability," the ALJ stated that, "[w]hile Dr. Knight assessed marked limitations in two areas, she does not provide any rational[e] for this assessment[,] which is not consistent with the nature and extent of the treatment she prescribed." Id. at 32. Although Ford accurately points out that the ALJ does not explicitly say Dr. Knight's treatment notes fail to "support" her assessment, she was not required to employ any "magic words" when her meaning was clear. See Weidner v. Kijakazi, No. 20-1250, 2022 WL 610702, at *12 (D. Del. Feb. 1, 2022) (denying claimant's appeal based on ALJ's failure to use the word "consistency" when describing basis for rejecting treating physician opinion) (citing Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009) ("The ALJ . . . need not employ particular 'magic' words.")), report and recommendation adopted, 2022 WL 610678 (D. Del.

Feb. 16, 2022).

The ALJ noted that "the longitudinal evidence of record" supported her RFC while Dr. Knight's own treatment notes failed to support her medical opinion; this plainly means the ALJ found the opinion unsupported. R. at 32. Her discussion of the rest of the medical evidence suggested the same. Id. at 28-32 (summary of medical evidence that notes, inter alia: (1) GAF scores of 60, suggesting mild to moderate symptoms; (2) October 2013 treatment reports noting Ford was "doing so much better, to a point where she has questioned if she needs meds"; (3) repeated notes of "stable" and "mild" symptoms and normal mental status examinations; (4) notes showing that Ford's "primary problem was lack of sleep"; and (5) the normal EMG/nerve conduction study in November 2016). The ALJ met her obligation to assess the "supportability" of Dr. Knight's opinion.

The ALJ's failure to give the opinion additional weight based on Dr. Knight's specialty and long-term relationship with Ford is also not legal error. The new regulations prohibit assigning any particular weight to a medical opinion, instructing ALJs to instead assess their persuasiveness. 20 C.F.R. § 404.1520c; DeJesus, 2022 WL 1062914, at *9.

Finally, with respect to Ford's argument that the ALJ should not have considered the care she provided her own children, it is well established that the ALJ was entitled to consider Ford's activities of daily living. Hock v. Comm'r Soc. Sec., 646 F. App'x 171, 173-74 (3d Cir. 2016) (affirming ALJ opinion that discounted opinion of treating physicians based on claimant's activities); Hoyman v. Colvin, 606 F. App'x 678, 680 (3d Cir. 2015) (affirming ALJ opinion that discounted reported limitations based in part on inconsistency with daily activities); Holiday v. Barnhart, 76 F. App'x 479, 482 (3d Cir. 2003) (same). It was fair for the ALJ to point out that Ford was able to perform the tasks required to homeschool three children, which Ford testified

5

included researching and choosing their curricula and helping the children with their work. R. at 53; see also, e.g., Giese v. Berryhill, No. 17-1244, 2019 WL 359456, at *7 (W.D. Pa. Jan. 29, 2019) (denying claim based on analysis which included claimant's ability to homeschool her autistic son); Johnson v. Berryhill, No. 17-2211, 2018 WL 7813741, at *5 (E.D. Pa. Dec. 19, 2018) (denying claim based on analysis which included staying home with one and four-year-old children); Motes v. Colvin, No. 16-1309, 2017 WL 1329472, at *12 (M.D. Pa. Apr. 11, 2017) (denying claim based on analysis which included assisting claimant's home-schooling daughter).

In terms of Ford's claims of factual errors, Dr. Knight proposed marked limitations for Ford on the basis that she had "mood issues that [a]ffect things" and was "unable to handle stress." R. at 744-45. The ALJ effectively agreed, but stated, "[w]hile the evidence suggests that [Ford] may no longer be able to perform skilled work as she did in the past, there is no indication that she could not perform unskilled work." Id. at 32. To accommodate Ford's mental limitations, the ALJ limited Ford to "simple, routine tasks, limited interaction with the public, coworkers and supervisors, and work in a low stress environment," but noted that even these extensive limitations "do not preclude all work." Id.

The record citations Ford provides do not undermine the ALJ's conclusion that Ford suffered from significant, although not necessarily work-preclusive, limitations. For example, Ford cites a June 2013 medical record in which she made extensive complaints of mood swings, insomnia, fibromyalgia, etc. Pl. Br. at 12 (citing R. at 491). Ford quotes, however, from her own complaints. Id. The following page shows the examination, in which she was observed to be "in no acute distress," with a normal mental status exam other than her self-reported low mood. R. at 492. The same combination of extensive complaints and largely normal exam took place in January 2014, when her mood disorder was described as "stable." Id. at 487. By

August 2014, she was starting to recognize her own progress and discussed tapering her medications in anticipation of getting pregnant. Id. at 483. By December 2014, she was pregnant, and contacted Dr. Knight because she was having trouble sleeping. Id. at 427. In March 2015, five months into her pregnancy, Ford called Dr. Knight about getting back on the medications she had weaned herself off for pregnancy to improve her sleep. Id. at 426. She increased that medication the following month, id. at 422, but after her son was born in August 2015, noted her "irritability since pregnancy has calmed," id. at 392. In August 2015, her mental status examination also was almost completely normal and her physician could not "see her mood disorder presently underneath" her anxiety. Id. at 392. In September 2016, when she restarted one of her medications, she noted that "on medication she doesn't get really bad" and had another largely normal mental status examination. Id. at 391. The rest of the record citations Ford relies on document her condition after the DLI. See, e.g., id. at 368-69 (records from June 7, 2017), 368 (July 26, 2018), 367 (August 7, 2017), 385 (August 9, 2017), 381 (October 6, 2017).

Ford's argument that her leaving work in January 2014 was precipitated by a "meltdown" and was thus a symptom of her disorder is contradicted by the record. Pl. Br. at 14 ("her withdrawal from work and desire to remain in the home is reasonably attributable to her debilitating mental and physical impairments.") (citing R. at 487). The document cited by Ford does not connect her "meltdown" to her decision to stop working. Instead, the "meltdown" reference is separated onto a different line from the discussion of leaving work and is instead placed on the same line as a notation that "she wants a kid." Id. Although the note acknowledges Ford was experiencing "work issues," it relates them to "[h]er decision to leave work and be[] a housewife." Id. Moreover, several months earlier, Ford told Dr. Knight she

7

"ha[d] always wanted to be a stay-at-home mother." Id. at 488.

Ford contends the ALJ erred by finding she had weaned herself off medications during pregnancy and that she had actually increased her medications during pregnancy. Pl. Br. at 15 (citing 367-69, 422). In fact, both are true. Ford weaned herself off medication at the start of her 2014-15 pregnancy and then returned to them with increased dosages during the pregnancy's later stages. R. at 422, 426-27. The record is unclear if she ever fully weaned herself off medications for the start of her 2016-17 pregnancy, but there is a September 2016 note stating "she wanted to try to do things without medications for awhile" just as she was "look[ing] to try having another child." Id. at 391. The ALJ's statement that Ford "was able to wean herself off medications in order to get pregnant twice" is not necessarily incorrect, and even if Ford never fully weaned herself off all her medications during the second pregnancy, the error is harmless. Id. at 32; Woodson v. Comm'r Soc. Sec., 661 F. App'x 762, 764 (3d Cir. 2016).

Finally, the ALJ's reasoning that the post-DLI date of Dr. Knight's opinion made the opinion less persuasive does not violate any regulatory requirement and is based on an accurate assessment of the timeline. See Espino v. Astrue, No. 09-2603, 2011 WL 815802, at *4 (E.D. Pa. Mar. 8, 2011) (denying claimant's appeal and confirming ALJ's discrediting of treating physician opinion offered well after claimant's DLI even though it purported to address earlier time period). I may not re-weigh the evidence. Hartraft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

Ford also objects to the ALJ's observation that Dr. Knight references her post-DLI Bipolar Disorder diagnosis. Pl. Br. at 16-17. This observation, however, was made in combination with the ALJ's observation that Dr. Knight's opinion was reached years after the DLI, suggesting the ALJ saw Dr. Knight's reference to the post-DLI diagnosis as evidence that

8

Dr. Knight was viewing Ford's condition in its present state rather than its state at the time of Ford's DLI. The ALJ was entitled to make such an inference. See Kolpack v. Colvin, No. 13-2257, 2014 WL 2965903, at *10 (D.N.J. July 1, 2014) (finding claimant did not qualify for benefits even though his later-diagnosed condition was present before his DLI because it did not become disabling until after the DLI).

VE Hypothetical

At Ford's ALJ hearing, the ALJ posed a hypothetical to the VE comprised of all the limitations she ultimately included in Ford's RFC. R. at 59. The VE testified that there were at least three jobs Ford could perform in the national economy with those limitations, id. at 60, and the ALJ relied on that testimony to find Ford was not disabled, id. at 33. Ford contends the Commissioner failed to meet her burden to show there were jobs Ford could perform in the national economy because the hypothetical the ALJ posed to the VE failed to include all the limitations Dr. Knight's opinion recommended. Pl. Br. at 19-20.

As discussed above, however, the ALJ supported her rejection of those limitations with substantial evidence. "[H]ypotheticals need not include 'every impairment alleged by a claimant.'" Thomas v. Comm'r Soc. Sec., 819 F. App'x 90, 92 (3d Cir. 2020) (citing Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)). Because the ALJ supported her RFC with substantial evidence, including its exclusion of further limitations recommended by Dr. Knight, "the hypotheticals accurately portrayed [her] substantiated impairments." Thomas, 819 F. App'x at 93; see also Winward v. Comm'r Soc. Sec., 629 F. App'x 393, 396 (3d Cir. 2015) (finding hypothetical to VE that excluded limitations proposed in discredited treating physician opinion included all credibly established limitations).

Separation of Powers

Ford also contends the ALJ opinion denying her benefits is "constitutionally defective and should be reversed by this court" because the provision in the Social Security Act limiting the President's authority to remove the Social Security Commissioner to "neglect of duty or malfeasance in office" violates the Constitution's separation of powers.  Pl. Br.  at 2-6; 42 U.S.C. § 902(a)(3).  The Commissioner concedes the violation.  Def. Br. at 8 (citing Office of Legal Counsel, U.S. Dep't. of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).  The question I address is therefore limited to whether such violation requires setting aside the denial of Ford's claim.

Because the Constitution vests the President, exclusively, with "executive Power," he has virtually unrestricted authority to remove those wielding executive power on his behalf.  Art. II, § 1 cl. 1; Myers v. United States, 272 U.S. 52 (1926).  The Supreme Court has recognized only two exceptions to this rule: (1) a limitation to removal for good cause when Congress has created expert agencies led by a group of principal officers; and (2) tenure protections for certain inferior officers with narrowly defined duties.  Humphrey's Executor v. United States, 295 U.S. 602 (1935); Morrison v. Olson, 487 U.S. 654 (1988).  Thus, statutory criteria limiting a President's ability to remove "a single" individual who runs "an independent agency" violate the separation of powers.  Seila Law LLC v. Consumer Financial Protection Bureau, 140 S. Ct. 2183, 2192 (2020).

Analogizing this separation of powers issue to an appointments clause claim, Ford contends "the ALJ and the Appeals Council exercised power that they did not lawfully possess due to a constitutionally defective delegation of power."  Reply at 6-8.

10

Because removing the last sentence of 42 U.S.C. 902(a)(3) would remedy the constitutional flaw, the surviving portions of the statute are capable of functioning independently, and there is no suggestion that Congress would have preferred no Social Security Commissioner at all to a Commissioner who was removable at will, I find the offending sentence severable. Seila Law, 140 S. Ct. at 2209 (citing the severability standard from Free Enterprise Fund v. Public Company Accounting Oversight Bd., 561 U.S. 477, 509 (2010)); see also 42 U.S.C. 902(a)(3) ("The Commissioner shall be appointed for a term of 6 years, except that the initial term of office for Commissioner shall terminate January 19, 2001. In any case in which a successor does not take office at the end of a Commissioner's term of office, such Commissioner may continue in office until the entry upon office of such a successor. A Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term. An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office.").

The Supreme Court has recently explained that unconstitutional removal criteria do not automatically render all actions taken by individuals subject to such provisions void. Collins v. Yellen, 141 S. Ct. 1761, 1787 (2021). As long as there was no "constitutional defect in the statutorily prescribed method of appointment," the Court has found "no reason to regard any of the actions taken" by the individual "as void." Id.

Nonetheless, "it is still possible for an unconstitutional provision to inflict compensable harm." Id. at 1789. In Collins, the plaintiffs argued that, were it not for the unconstitutional removal provision, "the President might have replaced" the individual who approved the action they contested, and the Court agreed that the statutory provision "would clearly cause harm" if

11

the President had, for example, expressed displeasure with the action "and had asserted that he would" have removed the individual "if the statute did not stand in the way." Id.

Ford has not identified any compensable harm.³ Pl. Br. at 2-6. Instead, she argues that "harm from the conceded constitutional violation should be presumed without the need for strict causation." Reply at 7.

Collins, however, distinguishes individuals who have been unconstitutionally appointed from those subject to unconstitutional removal provisions. 141 S. Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken . . . as void."). Ford argues that, because the ALJ's opinion was issued under Commissioner Saul's authority, it "was in fact [his] own decision," and her compensable harm was that he denied her claim. Pl. Br. at 6 (citing 42 U.S.C. § 405(b)(1) ("The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment") and HALLEX-I-2-0-2(A) ("The Commissioner of Social Security has delegated the authority to hold hearings and issue decisions to administrative law judges")).

The harm Ford would need to identify for a successful separation of powers claim, however, is not harm caused by Saul exercising his lawfully-appointed authority. Rather, it

---

³ To the extent that the revised regulations governing the treatment of medical opinion evidence are responsible for the denial of Ford's claim, they cannot be attributed to Andrew Saul, who served as Commissioner at the time her claim was denied, because he was appointed after the regulations were enacted. https://blog.ssa.gov/social-security-welcomes-its-new-commissioner (Andrew Saul was appointed June 17, 2019); 82 Fed. Reg. 5844-01 ("Revisions to Rules Regarding the Evaluation of Medical Evidence" were promulgated on January 18, 2017); R. at 34 (ALJ opinion was issued March 16, 2020).

would have to be harm caused by Saul exercising authority he retained by virtue of the unconstitutional removal clause. To be entitled to relief, Ford must show "the statutory provision [] clearly cause[d] harm," not Saul himself. Collins, 141 S. Ct. at 1789. Because she has failed to do so, her claim is denied.[4]

An appropriate Order accompanies this Opinion.

---

[4] It appears that all the courts that have reviewed similar separation of power arguments in social security benefits appeals cases have also found they do not warrant a remand. See, e.g., Adams v. Kijakazi, No. 20-3591, 2022 WL 767806, at *10 (E.D. Pa. Mar. 14, 2022); High v. Kijakazi, No. 20-3528, 2022 WL 394750, *1+, (E.D. Pa. Feb. 09, 2022); Wicker v. Kijakazi, No. 20-4771, 2022 WL 267896 at *8-10 (E.D. Pa. Jan. 28, 2022); see also Kasey V. v. Commissioner of Social Security, No. 20-6153, 2022 WL 102048, *1, (W.D. Wash. Jan. 11, 2022); Crossley v. Kijakazi, No. 20-2298, 2021 WL 6197783, *1, (M.D. Pa. Dec. 31, 2021); Turk v. Commissioner of Social Security, No. 20-2157, 2021 WL 6755002, *1, (N.D. Ohio Dec. 23, 2021); Nathanial H. v. Kijakazi, No. 19-1280, 2021 WL 5921377, *1, (D. Or. Dec. 15, 2021); Kristine A. v. Commissioner of Social Security, No. 21-5239, 2021 WL 5918128, *1, (W.D. Wash. Dec. 15, 2021); Brand v. Kijakazi, No. 20-2219, 2021 WL 5868131, *1+, (D. Nev. Dec. 10, 2021); Alice A. v. Commissioner of Social Security, No. 20-5756, 2021 WL 5514434, *1, (W.D. Wash. Nov. 24, 2021); Perez-Kocher v. Commissioner of Social Security, No. 20-2357, 2021 WL 6334838, *1, (M.D. Fla. Nov. 23, 2021); Shannon R. v. Commissioner of Social Security, No. 21-5173, 2021 WL 5371394, *1, (W.D. Wash. Nov. 18, 2021); Michele T. v. Commissioner of Social Security, No. 20-6085, 2021 WL 5356721, *1, (W.D. Wash. Nov. 17, 2021).